```
              IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF PENNSYLVANIA
```

HENRICKS COMMERCE PARK, LLC,   )
                               )
            Plaintiff,         )
                               )
      vs.                      )  Civil Action No. 09-23
                               )
MAIN STEEL POLISHING CO., INC.,)
                               )
            Defendant.         )

**MEMORANDUM**

## I. INTRODUCTION

In this diversity action, Defendant, Main Steel Polishing Company, Inc., has moved to strike the jury demand in the complaint filed by Plaintiff, Henricks Commerce Park, LLC. For the reasons set forth below, the motion will be granted.

## II. FACTUAL ALLEGATIONS

In summary, Plaintiff's complaint alleges the following facts:

Plaintiff is an Ohio limited liability company with its principal place of business in Mercer, Pennsylvania. Defendant is a New Jersey corporation with its principal place of business in Tinton Falls, New Jersey. Defendant operates a plant in Harmony, Pennsylvania. (Complaint, ¶¶ 1-2).

In June 2000, Plaintiff purchased a 33-acre parcel of property near Austintown, Ohio from Danieli Corporation ("Danieli"), together with the 330,000 square foot building and

equipment located thereon ("the Facility"). Danieli financed the transaction and recorded a purchase money mortgage on the property. (Complaint, ¶ 6).

In connection with its purchase of the property, Plaintiff hired Civil & Environmental Consultants, Inc. ("CEC") to conduct a Phase I environmental assessment of the Facility. CEC's Phase I report, dated February 16, 2000, recommended a subsurface, or Phase II, investigation of several of the Facility's industrial areas. CEC's Phase II investigation revealed detectable concentrations of several volatile organic compounds, including Trichloroethene ("TCE"), in the groundwater under the Facility. However, based on the results of its Phase II investigation and the unlikely use of the groundwater under the Facility, CEC concluded that (1) impacts on surface water were not anticipated to exceed applicable standards, (2) potential health risks were not significant, and (3) no further investigation was warranted. (Complaint, ¶ 7).

On June 30, 2000, Plaintiff leased a portion of the Facility to Defendant for 10 years and 2 months. Under the final amendment to the lease, Defendant agreed to lease 242,594 square feet of the Facility for a base rent of $68,664.61 per month.[1] (Complaint, ¶ 8). Under the terms of the lease, Defendant agreed

---

[1]Plaintiff also leased space in the facility to several other commercial tenants, collecting rents totaling $20,419.00 per month from these tenants. (Complaint, ¶ 8).

2

(a) not to "place, store, install upon, discharge, release or generate on, in or under the Premises, or allow to escape from the Premises, any pollutants or other toxic or Hazardous Substances [as defined in the lease], ..." ("the Compliance Covenant"), (b) to defend and indemnify Plaintiff with respect to any costs, claims or demands arising out of its use of hazardous substances in the Facility during the term of the lease ("the Environmental Indemnification Covenant"), (c) to remediate any unlawful hazardous substances on or under the Facility in a timely manner ("the Remediation Covenant"), (d) to indemnify Plaintiff from any and all costs, claims or liability arising out of Defendant's use of the Facility ("the General Indemnification Covenant"), (e) that the failure to pay rent or any another charge or perform any non-monetary obligation in a timely manner constituted a default of the lease, and (f) that upon default or breach by Defendant, all rent due for the entire unexpired portion of the lease term was immediately due and payable. (Complaint, ¶¶ 9-10, 13-17).

In May 2002, a high voltage electrical substation near the Facility sustained damage. As a result, the commercial tenants of the Facility were unable to function until the substation was repaired. In response to the electric power issue, the tenants withheld significant rent payments which prevented Plaintiff from meeting its obligations to creditors. Consequently, Plaintiff

filed a Chapter 11 bankruptcy petition in the United States Bankruptcy Court for the Northern District of Ohio. (Complaint, ¶ 18).

Eventually, Plaintiff presented a reorganization plan to the Bankruptcy Court pursuant to which it would retain ownership of the Facility. Under the plan, Plaintiff entered into a settlement agreement with Danieli in which Plaintiff agreed to pay the balance of the purchase money mortgage, or $2,898,986.96, by January 15, 2007. As security for the agreement, Danieli held a deed to the Facility in escrow which could be recorded if Plaintiff defaulted and was unable to pay the balance of the mortgage debt by March 17, 2007 (following a 60-day notice and cure period). Plaintiff planned to pay the balance of the mortgage held by Danieli by securing a long-term refinancing loan from another lender. Defendant was very involved in Plaintiff's bankruptcy proceeding, participated in the reorganization plan, and was aware of Plaintiff's obligation to satisfy the mortgage held by Danieli on the Facility. (Complaint, ¶¶ 18-19).

On March 20, 2005, following the Bankruptcy Court's confirmation of Plaintiff's reorganization plan, Plaintiff retained Larry Newman, a financial broker, for assistance in securing a long-term lender to provide the funds to pay the balance of the mortgage on the Facility held by Danieli. Plaintiff also entered into discussions with a private

4

individual, Leo Kay, to secure a short-term bridge loan to pay Danieli in the event a long-term refinancing loan could not be obtained until after January 15, 2007.  (Complaint, ¶ 20).

Mr. Kay agreed to provide the bridge loan and sent a loan commitment letter to Plaintiff detailing the conditions under which he would loan $3.2 million to Plaintiff to pay Danieli until a long-term lender could be secured.  Among other things, Plaintiff was required to execute an environmental indemnity agreement in favor of Mr. Kay to indemnify him from any claims or costs incurred as a result of environmental problems at the Facility.  (Complaint, ¶ 21).

During the negotiations with Mr. Kay, Mr. Newman approached several lenders interested in providing a long-term refinancing loan to Plaintiff.  One of the potential lenders required a Phase I environmental assessment of the Facility, and, in late 2006, Plaintiff retained American Geosciences, Inc. ("AGI") to conduct a Phase I assessment.  (Complaint, ¶ 22).

During its Phase I assessment, AGI observed four full drums of TCE at the Facility.  In addition, AGI reported that it had interviewed a representative of Defendant who indicated that Defendant had used TCE in its processes until 2005.  In order to determine whether Defendant's use of TCE had adversely impacted the soil or groundwater at the Facility, AGI conducted a Phase II investigation, retesting the nine monitoring wells that CEC had

installed and sampled as part of CEC's Phase II investigation in 2000. The results of AGI's Phase II investigation indicated that concentrations of TCE had increased significantly since 2000. AGI concluded that a release of TCE had occurred at the Facility between CEC's Phase II investigation in 2000 and its Phase II investigation in January 2007. To Plaintiff's knowledge, no other tenant at the Facility used TCE in conducting its business since Plaintiff acquired the property in 2000. (Complaint, ¶¶ 23-28).

As a result of AGI's Phase II report regarding TCE contamination at the Facility, Plaintiff could not provide the environmental representations required by Mr. Kay and he withdrew his offer to provide a bridge loan. In addition, at least three financial institutions had considered providing a long-term refinancing loan to Plaintiff. However, in light of the Facility's TCE contamination, the financial institutions refused to commit to such a loan. (Complaint, ¶¶ 29-30).

On February 20, 2007, after numerous discussions with Defendant regarding its TCE contamination of the Facility, Plaintiff sent Defendant a letter detailing the discovery of Defendant's improper use of TCE and the contamination it had caused at the Facility and requesting Defendant to begin remediating the problem within 25 days to allow the bridge loan financing with Mr. Kay to proceed. Plaintiff emphasized that

6

prompt resolution of the TCE contamination was necessary for Plaintiff to obtain the bridge loan and the long-term refinancing loan.  However, Defendant failed to act.  (Complaint, ¶¶ 31-32).

Because of Defendant's TCE contamination of the Facility and its failure to initiate remediation, Plaintiff defaulted on its obligations to Danieli under their settlement agreement, and Danieli exercised its right to repossess the Facility, forcing Plaintiff out of business.  (Complaint, ¶ 33).

Based on the foregoing allegations, Plaintiff asserts the following claims against Defendant: Count I - Breach of the Compliance Covenant, Count II - Breach of the Environmental Indemnification Covenant, Count III - Breach of the General Indemnification Covenant, Count IV - Breach of the Remediation Covenant, Count V - Intentional Interference with Prospective Business Relations, Count VI - Private Qualified Nuisance, Count VII - Trespass and Count VIII - Negligence Per Se.

### III. LEGAL ANALYSIS

The right to a trial by jury is fundamental and courts indulge every reasonable presumption against waiver. Nevertheless, like all constitutional rights, the right may be waived.  To be valid, a jury waiver must be made knowingly and voluntarily based on the facts of the case.  <u>Tracinda Corp. v. DaimlerChrysler AG</u>, 502 F.3d 212, 222 (3d Cir.2007).  The burden of proving that a jury waiver was done both knowingly and

voluntarily falls on the party seeking enforcement of the waiver clause. A waiver is knowing and voluntary when the facts show that (1) there was no gross disparity in bargaining power between the parties; (2) the parties are sophisticated business entities; (3) the parties had an opportunity to negotiate the contract terms; and (4) the waiver provision was conspicuous. <u>First Union National Bank v. United States of America</u>, 164 F.Supp.2d 660, 663 (E.D.Pa.2001).

The jury waiver in the parties' lease for the Facility states:

> **Section 10.4   Remedies:**
>
> \*   \*   \*
>
> (b) The parties hereto hereby waive their right to require a trial (or determination of fact) by jury in any action or proceeding or counterclaim between the parties in any way connected with this Lease, the relationship of Landlord and Tenant, and Tenant's use or occupancy of the Premises, and/or claim of injury or damage.
>
> \*   \*   \*

(Complaint, Exh. A).
Based on Section 10.4(b) of the lease, Defendant asserts that Plaintiff has waived its right to a jury on the claims asserted in this case, and the jury demand should be stricken.

Plaintiff does not dispute its knowing and voluntary waiver of a jury in the parties' lease for the Facility. In fact, Plaintiff concedes that the jury waiver applies to the breach of contract claims asserted against Defendant in Counts I through IV

8

of the complaint.  Plaintiff does dispute, however, the applicability of the jury waiver to the tort claims asserted in Counts V through VIII of the complaint.  After consideration, the Court finds Plaintiff's argument in this regard unpersuasive.

It is difficult to imagine a broader waiver than the jury waiver set forth in Section 10.4(b) of the parties' lease agreement which, according to Defendant and not contradicted by Plaintiff, was drafted by Plaintiff's counsel.  (Document No. 21, p. 1).  The jury waiver applies to *any* action between the parties *in any way connected with* the lease agreement, the landlord/tenant relationship and Defendant's use or occupancy of the Facility under the lease agreement, and a review of the allegations in Counts V through VIII of the complaint dictates a conclusion that Plaintiff's tort claims are encompassed within this jury waiver.

With respect to Count V, the claim for intentional interference with prospective business relations arises out of Plaintiff's inability to procure the bridge loan and the long-term refinancing loan to satisfy the mortgage held by Danieli as a result of Defendant's refusal to remediate its alleged TCE contamination of the Facility.  In Count V, Plaintiff specifically refers to Defendant's alleged contamination of the Facility with TCE as a violation of the Compliance Covenant in the lease agreement.  Moreover, Defendant's alleged refusal to

9

remediate the TCE contamination would constitute a violation of the Remediation Covenant in the lease agreement.  Under the circumstances, Count V is *connected with* the parties' lease agreement, the landlord/tenant relationship and Defendant's use of the Facility and falls within the jury waiver.

Turning to Count VI, the claim for Private Qualified Nuisance relates to Defendant's alleged breach of its duty to protect Plaintiff and the other tenants of the Facility from TCE contamination, a duty which is specifically alleged to be based on "a contractual obligation," *i.e.*, the lease agreement.  Thus, Count VI also is *connected with* the parties' lease agreement, the landlord/tenant relationship and Defendant's use of the Facility and is covered by the jury waiver.

Finally, as to Counts VII and VIII, the claims for Trespass and Negligence Per Se pertain to Defendant's contamination of the groundwater beneath the Facility with TCE during its use of the Facility as a tenant.  These claims are merely breaches of the Compliance Covenant pleaded by Plaintiff as torts.  Clearly, Counts VII and VIII are *connected with* the parties' lease agreement, the landlord/tenant relationship and Defendant's use of the Facility and are subject to the jury waiver.

In support of its opposition to Defendant's motion to strike the jury demand as to its tort claims, Plaintiff cited three cases.  As noted by Defendant, however, two of the decisions were

issued by New York state courts and consist of one or two paragraphs. As further noted by Defendant, it is significant that neither decision quotes the language of the jury waiver at issue. As a result, the Court is unable to determine if the jury waivers in those cases were as broad as the jury waiver set forth in Section 10.4(b) of the parties' lease agreement. (Document No. 21, p. 3). See Tohn v. Botello, 148 N.Y.S.2d 568 (N.Y.App.Div.1955)(holding that since the landlord's proceeding was based upon the revocation of an alleged gratuitous license to use cellar space, and not upon the lease with the tenant, the jury waiver clause of the lease was inapplicable and the tenant was entitled to trial by jury); Parise v. Seaman Trucking Co., 104 N.Y.S.2d 318 (N.Y.App.Div.1951)(holding that the invoked jury waiver clause of the lease related only to actions brought to enforce the provisions of covenant numbered 23 of the lease, of which the jury waiver clause was an integral part, and that this was not such an action).

As to the third case cited by Plaintiff in support of its opposition to the present motion, in Rodenbur v. Kaufmann, 320 F.2d 679 (D.C.Cir.1963), a tenant sued her landlords and their manager for personal injuries allegedly sustained when she slipped and fell in a common passageway in the apartment building. The tenant failed to recover damages for her injuries in the district court. On appeal, she argued that the trial

11

judge, sitting without a jury, erred in entering an adverse judgment and that a motions court judge earlier had erred in striking her demand for a jury trial based on a jury waiver in her lease.  Although the jury waiver at issue was broad, the Court of Appeals for the District of Columbia concluded that the motions court judge had erred in striking Plaintiff's demand for a jury trial.  In reaching this conclusion, the Court of Appeals strictly construed the jury waiver against the landlords who had drafted the lease.  Because the tenant's injuries were sustained in a common passageway of the apartment building, rather than in the apartment she leased, the Court of Appeals concluded:

* * *

> This case did not involve terms or conditions of the lease, or covenants, or right to rent or possession, or any other such interest.  The clause, strictly construed as it must be, did not bar a jury trial as to rights which the tenant might have against the landlords unless issues with respect thereto arose out of or were in some way connected with the lease of her apartment....

* * *

320 F.2d at 684.

Unlike the tenant's personal injury claim in Rodenbur, Plaintiff's tort claims specifically arise out of Defendant's alleged breaches of covenants in the parties' lease agreement for the Facility.  As a result, the Court finds the situation presented in Rodenbur distinguishable.

12

Based on the foregoing, the jury waiver set forth in Section 10.4(b) of the parties' lease agreement for the Facility will be applied to Plaintiff's tort claims, as well as its breach of contract claims. Compare Brown v. Cushman & Wakefield, Inc., 235 F.Supp.2d 291 (S.D.N.Y.2002)(Provision in employment agreement that parties waived trial by jury "in any action, proceeding or counterclaim brought or asserted by either of the parties" against the other on "any matters whatsoever" arising out of agreement, applied to discrimination as well as breach of contract claims); Efficient Solutions, Inc. v. Meiners' Country Mart, Inc., 56 F.Supp.2d 982, 984 (W.D.Tenn.1999)("Because defendant's tort claims arise out of and relate to the contract and the negotiations which led to the contract, it is altogether appropriate to apply the contractual jury waiver clause.").

*William L. Standish*
William L. Standish
United States District Judge

Date: August 18, 2009